**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

AMY FINLEY O/B/O HERSELF AND
W.F., a minor child                                                      PLAINTIFF


V.                              NO. 4:06CV01576 GTE/JTR


MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                          DEFENDANT


## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

This recommended disposition has been submitted to United States District Judge G. Thomas

Eisele.  The parties may file specific objections to these findings and recommendations and must

provide the factual or legal basis for each objection.  The objections must be filed with the Clerk no

later than eleven (11) days from the date of the findings and recommendations.  A copy must be

served on the opposing party.  The District Judge, even in the absence of objections, may reject these

proposed findings and recommendations in whole or in part.

### I.  Background

Plaintiff, Amy Finley, has appealed the final decision of the Commissioner of the Social

Security Administration (the "Commissioner") denying her claim for "mother's insurance benefits"[1]

---

[1]*See* 42 U.S.C. § 402(g).  Mother's insurance benefits are intended to allow a surviving
spouse to elect not to work and care for children following the death of a wage-earner spouse. *See
Califano v. Boles*, 443 U.S. 282, 288-89 (1979).

and her minor child's claim for "child's insurance benefits."[2]  The Court's function on review is to

determine whether the Commissioner's decision is supported by substantial evidence on the record

as a whole and whether it is based on legal error.  *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997);

*see also*, 42 U.S.C. § 405(g).  While "substantial evidence" is that which a reasonable mind might

accept as adequate to support a conclusion,[3] "substantial evidence on the record as a whole" requires

a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of
> substantial evidence in support of the Commissioner's decision; we also take into
> account whatever in the record fairly detracts from that decision."  *Haley v.
> Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  Reversal is not warranted, however,
> "merely because substantial evidence would have supported an opposite decision."
> *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

The parties do not dispute the facts in this case.  Plaintiff and Wade W. Finley, Jr. ("Finley")

were married on October 6, 1990.  (Tr. 58.)  On April 2, 2001, the couple met with UAMS

physicians to discuss fertility treatments (Tr. 75) and, on May 1, 2001, they executed consent forms

outlining the terms of their participation in the UAMS In Vitro Fertilization and Embryo Transfer

Program.[4]  (Tr. 78-96.)  In June of 2001, physicians used Plaintiff's eggs and Finley's sperm to

---

[2]*See* 42 U.S.C. § 402 (d).  Child's insurance benefits are intended to replace support lost by
a child when a parent wage-earner dies.  *See Wolfe v. Sullivan*, 988 F.2d 1025, 1028 (10th Cir. 1993).

[3]*Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

[4]In one consent form, Finley agreed to "recognize any children born after the IVF procedure
as my legitimate offspring."  (Tr. 87.)  In another consent form, Plaintiff and Finley both
acknowledged that:  "Your embryos will remain frozen and in storage until you direct the IVF
personnel otherwise.  The legal status of frozen embryos is not known.  Should you get a divorce or
one or both of you die, the disposition of the frozen embryos might be determined in a court of law.
You should consider this issue very carefully and obtain expert legal advice if necessary."  (Tr. 92.)

produce ten embryos. (Tr. 75.) On July 2, 2001, two embryos were implanted in Plaintiff's uterus, while four were frozen for preservation.[5] Plaintiff later had a miscarriage of the implanted embryos. (Tr. 75.)

On July 19, 2001, Finley died in Arkansas, without leaving a will.[6] (Tr. 58.) On June 26, 2002, Plaintiff had two of the frozen embryos implanted in her uterus, resulting in a single pregnancy. (Tr. 75.) On February 14, 2003, Plaintiff obtained an Order from the Lonoke County Circuit Court which sought to establish the paternity of her unborn child:

> [U]pon delivery of the child, borne by the [Plaintiff] now pregnant, that the State Registrar of the Arkansas Department of Health, Division of Vital Records, shall enter and state upon the certificate of birth that Wade W. Finley, Jr., now deceased, is the father of [W.F.]; [a]nd that, thereafter, all State and Federal Agencies, of the United States of America, shall uphold the findings of this Court's conclusion of paternity - in [Plaintiff] the mother and Wade W. Finley, Jr. the father - for any and all lawful purposes; and, that [W.F.] is the legitimate child of [Plaintiff] and Wade W. Finley, Jr. for any and all lawful purposes.

(Tr. 73.)[7]

W.F. was born on March 4, 2003. (Tr. 30.) On April 11, 2003, Plaintiff filed her claim with the Social Security Administration for mother's insurance benefits and child's insurance benefits, based on the earnings record of Finley. (Tr. 23.)

Under the Social Security Act, a child[8] is entitled to benefits if he is the dependent child of

---

[5]The remaining four embryos were not preserved.

[6]The cause of death was an accidental electrocution.

[7]This Order was entered in *In re Baby Finley*, Case No. DR2003-82.

[8]"Child" means "the child or legally adopted child of an individual[.]" 42 U.S.C. § 415(e).

an individual who dies while insured.  *See* 42 U.S.C. § 402(d).[9]  In determining whether a claimant is the "child" of a deceased insured, the Commissioner must "apply such law as would be applied in determining the devolution of intestate personal property . . . by the courts of the State in which [the insured] was domiciled at the time of his death[.]" 42 U.S.C. § 416(h)(2)(A).[10]  In deciding whether the claimant has "inheritance rights as the natural child of the insured[,]" the Commissioner uses "the law on inheritance rights that the State courts would use to decide whether you could inherit a child's share of the insured's personal property if the insured were to die without leaving a will."  *See* 20 C.F.R. § 404.355(b)(1).

---

[9]42 U.S.C. § 402(d), provides in pertinent part, as follows:

(1) Every child (as defined in section 416(e) of this title) of an individual entitled to old-age or disability insurance benefits, or of an individual who dies a fully or currently insured individual, if such child--

(A) has filed application for child's insurance benefits,

(B) at the time such application was filed was unmarried and (I) either had not attained the age of 18 or was a full-time elementary or secondary school student and had not attained the age of 19, or (ii) is under a disability (as defined in section 423(d) of this title) which began before he attained the age of 22, and

(C) was dependent upon such individual--

(I) if such individual is living, at the time such application was filed,

(ii) if such individual has died, at the time of such death, or

(iii) if such individual had a period of disability which continued until he became entitled to old-age or disability insurance benefits, or (if he has died) until the month of his death, at the beginning of such period of disability or at the time he became entitled to such benefits,

shall be entitled to a child's insurance benefit. ...


[10]If an applicant does not qualify as a "child" under 42 U.S.C. § 416(h)(2)(A), there are other means to establish "child" status.  *See* 42 U.S.C. § 416(h)(2)(B) (claimant is "child" if insured and the other parent underwent a marriage ceremony that would have been valid but for certain legal impediments); 42 U.S.C. § 416(h)(3)(C)(i) (claimant is "child" if, before the death of the insured, the insured had acknowledged the claimant to be his son or daughter, had been decreed by a court to be the parent of the claimant, or had been ordered to pay child support); 42 U.S.C. § 416(h)(3)(C)(ii) (claimant is "child" if there is satisfactory evidence that the insured was the claimant's parent and insured was living with or supporting the claimant when the claim was filed).

During the administrative proceedings in this case, Plaintiff claimed that there were no Arkansas statutes specifically addressing the inheritance rights of a child conceived through in vitro fertilization ("IVF").  Thus, Plaintiff sought to rely on the Arkansas legitimacy statute which provides that  "[a]ny child conceived following artificial insemination of a married woman with the consent of her husband shall be treated as their child for all purposes of intestate succession. Consent of the husband is presumed unless the contrary is shown by clear and convincing evidence."  *See* Ark. Code Ann. § 28-9-209(c).  Because W.F. was "conceived" by IVF prior to his father's death and while his parents were married, Plaintiff argued that W.F. should be deemed to have inheritance rights.[11]

Plaintiff's and W.F.'s claims for Social Security benefits were denied at the initial and reconsideration levels.  On June 16, 2006, the Administrative Law Judge ("ALJ") overruled those decisions and awarded mother's and child's insurance benefits. (Tr. 17-20.) On December 14, 2006, the Appeals Council found both claims to be without merit and reversed the ALJ's decision.  (Tr. 5-13.)

After acknowledging the lack of a "clear definition" of "conception" under Arkansas state law, the Commissioner looked to "the generally accepted definition of the term in the medical community" and concluded that "conception" occurred when "the embryo was implanted in the mother's uterus after the wage earner died."  (Tr. 11.)   The Commissioner went on to find that: (1) Plaintiff's reliance on the Arkansas legitimacy statute was misplaced; (2) the Lonoke Circuit Court's Order was "not consistent with the law as enunciated by the highest court in the State of Arkansas"

---

[11]Of course, the relevant portion of the Arkansas legitimacy statute refers only to a child conceived using *artificial insemination*, not IVF.  Thus, on its face, the Arkansas legitimacy statute confers *no inheritance rights* on a posthumously born child conceived using IVF.

(Tr. 10-11); (3) W.F. was the biological child of Finley who was dead and no longer married to Plaintiff at the time that W.F. was conceived and born (Tr. 12); and (4) W.F. did not have "inheritance rights in [Finley's] estate" and thus did "not have status as the child of the wage earner pursuant to [42 U.S.C. § 416(h)(2)(A)]." (Tr. 12.) Because Plaintiff's claim for "mother's insurance benefits" was contingent on having "an entitled child of the wage earner in her care," the Commissioner also found that her claim must be denied. (Tr. 12.)

On October 13, 2006, Plaintiff filed her Complaint appealing the final decision of the Commissioner to this Court. (Docket entry #1.) On May 24, 2007, the parties filed a Joint Motion requesting that the briefing schedule be stayed, and that the Court certify a dispositive question of law to the Arkansas Supreme Court pursuant to Ark. R. Sup. Ct. 6-8. (Docket entry #14.)

In the parties' Joint Motion, they agreed that "[t]he determinative issue presented in this action is whether [W.F.] is entitled to inherit from [Finley] under Arkansas intestacy law." (Docket entry #14 at ¶ 3.) They also agreed that "there is no controlling Arkansas precedent on the determinative issue that is directly on point." (Docket entry #14 at ¶ 7.) Thus, they requested that the Court certify the question of "whether a child, who was created through IVF during his parents' marriage, but implanted into the mother's uterus after the father's death, can inherit from the father under Arkansas intestacy law as a surviving child." (Docket entry #14 at 4.) *According to the parties, the answer to this question would " resolve this action."* (Docket entry #14 at ¶7.)

On June 13, 2007, United States District Judge G. Thomas Eisele entered an Order granting the Joint Motion and certifying the following question of law to the Arkansas Supreme Court:

> Does a child, who was created as an embryo through IVF during his parents' marriage, but implanted into his mother's womb after the death of his father, inherit from the father under Arkansas intestacy law as a surviving child?

6

(Docket entry #16.) On June 28, 2007, the Arkansas Supreme Court accepted the certified question. *Finley v. Astrue*, 370 Ark. 429, 260 S.W.3d 717 (2007) (*per curiam*).

On January 10, 2008, the Court handed down its decision answering the certified question in the negative. *Finley v. Astrue*, 372 Ark. 103, ___ S.W.3d ___ (2008). According to the Court, the Arkansas posthumous heir statute governed "whether a child, created as an embryo through in vitro fertilization during the child's parents' marriage, but implanted into the child's mother's womb after the death of the child's father, was 'conceived before' the decedent's death." *See* Ark. Code Ann. § 28-9-210(a).[12] *Finley*, 372 Ark. at 109. The Court applied its rules of statutory construction to hold that, because the posthumous heir statute was enacted in 1969, years before the advent of IVF, the Arkansas General Assembly could not have intended for an embryo created using that technology, but implanted after the father's death, to inherit under intestate succession:[13]

> It is clear from the statute that in order to inherit through intestate succession as a posthumous descendant, the child must have been conceived before the decedent's death. However, the statutory scheme fails to define the term "conceived." While we could define that term, we find there is no need to do so, as we can definitively say that the General Assembly, in enacting Act 303 of 1969, § 12, now codified at Ark.Code Ann. § 28-9-210, did not intend for the statute to permit a child, created

---

[12]In pertinent part, the posthumous heir statute provides the following:
> (a) Posthumous descendants of the intestate conceived before his or her death but born thereafter shall inherit in the same manner as if born in the lifetime of the intestate.

Ark. Code Ann. § 28-9-210(a).

[13]The Arkansas legitimacy statute, Ark. Code Ann. § 28-9-209(c) was also enacted in 1969, and, while it addresses the status of children born using artificial insemination, it makes no mention of children born using IVF technology. The Court in *Finley* found that the Arkansas legitimacy statute was *not* relevant to its decision: "In addition, both parties discuss Ark. Code Ann. § 28-9-209(c). . . . That statute is inapposite for two reasons. First and foremost, the statute goes to the legitimacy of a child, and, second, it specifically references artificial insemination, not in vitro fertilization, which, as already noted in the footnote above, are two completely different procedures." *Finley*, 372 Ark. at 111.

> through in vitro fertilization and implanted after the father's death, to inherit under intestate succession. Not only does the instant statute fail to specifically address such a scenario, but it was enacted in 1969, which was well before the technology of in vitro fertilization was developed. *See* Janet L. Dolgin, *Surrounding Embryos: Biology, Ideology, & Politics*, 16 HEALTH MATRIX: J.L. & MED. 27 (2006) (observing that the first birth resulting from in vitro fertilization was in 1978). *See also* Dena S. Davis, *The Puzzle of IVF*, 6 HOUS. J. HEALTH L. & POL'Y 275 (2006) (observing that the first successful birth of a child from a cryopreserved embryo was in 1984).

*Finley*, 372 Ark. at 110. The Court concluded its decision by "strongly encourag[ing] the General Assembly to revisit the intestacy succession statutes to address the issues involved in the instant case and those that have not but will likely evolve."*Finley*, 372 Ark. at 112.

Following its receipt of the *Finley* decision, this Court lifted the stay and both parties filed their Appeal Briefs. (Docket entries #24 and #27.) Thus, the issues are now joined and ready for disposition.

## II.  Discussion

In Plaintiff's Appeal Brief, she argues that the Commissioner erred in denying her claims for benefits because his decision: (1) violated her and her son's rights to equal protection under the 5th and 14th Amendments; (2) failed to give full faith and credit to the February 14, 2003 Order of the Lonoke County Circuit Court; and (3) was contrary to established law supporting the award of benefits. The Court will address each of these arguments separately.

### A.      Plaintiff's Equal Protection Argument

Plaintiff makes two distinct equal protection arguments.  First, she contends that the Commissioner's application of Arkansas intestacy law, as interpreted by the Arkansas Supreme Court in answering the certified question, deprives her of equal protection because it "created a whole new class of children who will be deprived of certain rights solely because they were not

conceived and born in a 'normal' or 'accepted' manner." Second, she asserts that 42 U.S.C. § 416(h)(2)(A) deprives her of equal protection because it incorporates state intestacy law, which creates the possibility that claimants will be treated differently on a state-by-state basis. (*Pltff's App. Brf.* at 4.)

### 1.    Arkansas's Posthumous Heir Statute And The Equal Protection Clause

According to Plaintiff, the Arkansas Supreme Court's construction of the posthumous heir statute "created a whole new class of children who will be deprived of certain rights solely because they were not conceived and born in a 'normal' or 'accepted' manner." Plaintiff contends that this new classification of children "conceived by in vitro fertilization within the boundaries of the state of Arkansas, cannot pass constitutional muster."[14]   (*Pltff's App. Brf.* at 4.)

---

[14]The Commissioner responds, in part, that Plaintiff's constitutional attack on the Arkansas posthumous heir statute is not properly before the Court. The Commissioner characterizes Plaintiff's attack as "mixing state constitutionality issues with federal ones," and argues that "[r]ather than consider Plaintiff's attack on a state law, this Court should simply follow the Arkansas Supreme Court's reasonable interpretation of Arkansas law." (*Dft's App. Brf.* at 8-9.)

To the extent this Court is required to interpret the meaning of the Arkansas posthumous heir statute, it agrees that it must defer to the Arkansas Supreme Court's interpretation of that statute. *See, e.g., Bush v. Palm Beach County Canvassing Bd.*, 531 U.S. 70, 76 (2000) (*per curiam*) ("As a general rule, this Court defers to a state court's interpretation of a state statute.") Furthermore, the Court agrees that it should not address any question concerning "state constitutionality," *i.e.*, whether the Arkansas Supreme Court's interpretation of the posthumous heir statute violates the Arkansas state constitution.

Importantly, however, Plaintiff argues that the Arkansas Supreme Court's interpretation of the posthumous heir statute, as it is applied to her son by the Commissioner via § 416(h)(2)(A), violates her son's rights under the equal protection guarantee of the United States Constitution. This constitutional question is squarely before the Court. *See Lawrence v. Chater*, 516 U.S. 162 (1996) (*per curiam*) (noting the Commissioner's concession that, in some cases, the Act's incorporation of state intestacy law requires a determination of whether the state statute is constitutional); *Cox v. Schweiker*, 684 F.2d 310 (5th Cir. 1982) ("We are convinced that the structure and language of [section 416(h)(2)(A)], referring to state law on intestate inheritance, makes relevant the issue of the constitutionality of a particular state law.") In fact, the Commissioner acknowledges that "[a]lthough Plaintiff briefly raised constitutional concerns in [her] brief to the Arkansas Supreme Court, the Arkansas Supreme Court did not address constitutional issues in upholding the Commissioner's

9

Before beginning its equal protection analysis, the Court must first determine the appropriate level of constitutional scrutiny to be applied to the statutory classification created by the Arkansas Supreme Court's decision in *Finley*.[15]  The Arkansas posthumous heir statute, by its express terms, differentiates between those children "conceived" before and after the intestate decedent's death. While the Arkansas Supreme Court declined to define the term "conceive," it unequivocally held that, under the posthumous heir statute, an embryo created through IVF while his parents were married, but implanted in his mother's womb *after* the father's death, was *not* "conceived" before the father's death.[16]  By construing the statute in this way,  the Court created a classification for IVF children based on whether their embryos were implanted in their mothers' wombs while their fathers

---

interpretation of Arkansas intestacy law." (*Dft's App. Brf.* at 9.)  If, as the Commissioner suggests, Plaintiff did raise her equal protection argument with the Arkansas Supreme Court, which declined to address the issue, it begs the question of what else Plaintiff could have done to obtain review of her claim.

[15]Laws that discriminate based on a suspect class, such as race, or that impinge upon a fundamental right, are subject to "strict scrutiny," and must be "narrowly tailored to achieve a compelling government interest."  *See Parents Involved v. Seattle School Dist.*, 127 S. Ct. 2738, 2751 (2007) (internal quotations omitted).  Laws that discriminate based on certain other classifications, such as gender and illegitimacy, are subject to "intermediate scrutiny" and violate equal protection unless the classification furthers important governmental objectives, and the discriminatory means employed are substantially related to the achievement of those governmental objectives.  *See Clark v.* Jeter, 486 U.S. 456, 461 (1988).  All other laws are subject to the deferential "rational basis" review, under which the "Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification; the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decision maker; and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Fitzgerald v. Racing Ass'n*, 539 U.S. 103, 107 (2003) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11-12 (1992)).

[16]This holding makes it clear that the Arkansas Supreme Court did *not* believe W.F. was conceived at the moment his mother's egg was fertilized with his father's sperm using IVF technology.  By default, this means the Court must have viewed some subsequent event, perhaps the implantation of the embryo in Plaintiff's womb, as the moment of conception for W.F.

were alive.

Plaintiff strongly implies that the appropriate level of constitutional scrutiny for the classification created under the Arkansas posthumous heir statute is rational basis review.[17] She goes on to cite three cases to support her argument that, under rational basis review, this classification scheme is unconstitutional.

First, Plaintiff cites *Jimenez v. Weinberger*, 417 U.S. 628 (1974), a case in which the Court considered an equal protection challenge by illegitimate children who sought benefits based on the disability of an insured parent.  Under 42 U.S.C. § 402(d) and § 416(h), illegitimate children born *after* an insured parent became disabled qualified for benefits, without any showing of dependency, if: (1) state intestacy law permitted them to inherit from the insured parent; (2) their illegitimacy resulted from formal, nonobvious defects in their parents' marriage; or (3) they were legitimated in accordance with state law.  *Jimenez*, 417 U.S. at 634-35.  An illegitimate child who did not meet the statutory criteria could qualify only if the insured parent contributed to the child's support or lived with him *prior to* the onset of the parent's disability.

The class of claimants in *Jimenez* were illegitimate children born *after* the onset of their father's disability, who: (1) lived with their father; (2) were acknowledged by their father to be his children; and (3) were supported by their father.  Nonetheless, the Commissioner took the position that these claimants were prohibited from receiving benefits because they:  could not meet any of the statutory criteria for after-born illegitimate children; and, due to their having been born after their father became disabled, they could not prove dependency prior to the onset of his disability.

---

[17]*See Pltff's App. Brf.* at 4 ("A statutory classification must be rationally related to a legitimate governmental purpose."); and 14 ("There is simply no rational basis for denying W.F. benefits based solely upon the mother and father's choice of methodology for creating a new life.")

Noting that the primary purpose of the statute was to provide support for dependents of a disabled wage earner, the Court held that the statutory classification scheme was unconstitutional. *Jimenez*, 417 U.S. at 634, 637.  According to the Court, the statute effectively created two sub-classes of after-born illegitimate children. The first sub-class consisted of children who qualified for benefits because they could: (1) inherit property under state intestacy laws; (2) were legitimated under state law; or (3) were illegitimate due to a defect in their parents' marriage ceremony.  *Id.* at 635-36.  The second sub-class consisted of all other after-born illegitimate children who did not meet the preceding criteria and were barred from benefits. The Court found that this distinction among after-born illegitimate children was not rationally related to any legitimate purpose of the Act, and therefore deprived the second sub-class of equal protection.[18]  *Id.* at 636-37.

Second, Plaintiff cites *Mathews v. Lucas,* 427 U.S. 495 (1976) for the proposition that "children born out of wedlock cannot be treated differently from those who are legitimate." (*Pltff's App. Brf.* at 4.)  In *Mathews,* the Court considered a portion of the child's benefit statute governing eligibility for benefits based on the death of an insured parent.  At issue was a provision which denied child's insurance benefits to an illegitimate child, despite a clear showing of paternity, where such a child failed to prove dependency on his deceased father at the time of his death.  In contrast, the statute made the following categories of children presumptively dependent, without a showing of actual dependency: (1) legitimate children; (2) children entitled to inherit personal property from the insured under state intestacy law; (3) children whose parents had gone through a marriage ceremony, resulting in a purported marriage that would have been valid but for a nonobvious legal

---

[18]In *Jimenez,* the Court declined to consider whether illegitimacy was a "suspect classification." *Jimenez*, 417 U.S. at 631-32.

12

defect; (4) children of an insured who had acknowledged the children to be his in writing; and (5) children of an insured, where the insured had been decreed by a court to be their father, or ordered by a court to support the children because they were his. *Mathews*, 427 U.S. at 498-99.

The Court found no equal protection violation and upheld the statute. In doing so, it concluded that illegitimate children could be required to establish actual dependency, even though other children (both legitimate and illegitimate) were presumed to be dependent if they satisfied the various statutory presumptions. *Id.* at 507-09. The Court also rejected the argument that laws which discriminated between legitimate and illegitimate children were subject to strict scrutiny. *Id.* at 504. In applying intermediate scrutiny, the Court acknowledged that the various presumptions of the statute might result in similarly situated children being treated differently in those situations where no proof of dependency was required.[19] *Id.* at 503-04. However, the Court held that the statutory presumptions which created the potential for this disparate treatment were substantially related to the likelihood of the child's dependency at the time of the insured's death and furthered a legitimate governmental interest in administrative convenience. *Id.* at 509-10.

Finally, Plaintiff cites *Trimble v. Gordon*, 430 U.S. 762 (1977), for the proposition that "a

---

[19]The Court distinguished *Jimenez* because the statute in that case conclusively denied benefits to a class of illegitimate children, regardless of a showing of dependency. *Mathews*, 427 U.S. at 511. In contrast, the statute in *Mathews* provided an alternate way of proving dependency because "any otherwise eligible child may qualify for survivorship benefits by showing contribution to support or cohabitation, at the time of death." *Id.*

The Court in *Mathews* did not use the nomenclature of "intermediate scrutiny" to describe its equal protection review. However, the Court later characterized *Mathews* as applying "intermediate scrutiny" to classifications based on illegitimacy. *See Clark v. Jeter,* 486 U.S. 456, 461 (1988) ("Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on . . . illegitimacy.") (*citing Mathews*). Thus, the Court's decision in *Clark* made it clear that *intermediate level scrutiny* should be applied in analyzing a statutory classification based on illegitimacy.

statutory disinheritance of children born out of wedlock and not legitimized by the subsequent marriage of the parents is unconstitutional." (*Pltff's App. Brf.* at 4-5.) In *Trimble*, the Court struck down an Illinois statute that precluded all illegitimate children from inheriting from their fathers through intestate succession, while allowing all legitimate children to inherit.  The Court recognized the state interests in establishing a method of property distribution and avoiding problems of proof of paternity. However, it found the distinction between legitimate and illegitimate children was not reasonably related to these interests, and did not justify a complete exclusion of illegitimate children.[20]  *Trimble*, 430 U.S. at 770.  The Court also found the statutory exclusion to be overbroad because, "[f]or at least some significant categories of illegitimate children of intestate men, inheritance rights can be recognized without jeopardizing the orderly settlement of estates." *Trimble*, 430 U.S. at 771.

Other than citing these three cases, Plaintiff does not develop her equal protection argument beyond insisting that the Court's interpretation of the posthumous heir statute in *Finley* treats "legitimate" children differently, based on the scientific method used to create them.  In making this argument, Plaintiff overlooks the fact that the Arkansas Supreme Court made *no reference* to children being "legitimate" or "illegitimate."  Rather, the Court based its entire decision on the finding that, in 1969, the Arkansas legislature simply could not have intended "for the statute to permit a child, created through in vitro fertilization and implanted after the father's death, to inherit under intestate succession." *Finley*, 372 at 110.  The Court also explicitly held that the Arkansas

---

[20]Again, the Court did not label its review as "intermediate scrutiny," but made it clear that its review was between strict scrutiny and rational basis review: "Despite the conclusion that classifications based on illegitimacy fall in a realm of less than strictest scrutiny, [*Mathews*] also establishes that the scrutiny is not a toothless one." *Trimble*, 430 U.S. at 767 (internal quotations and citations omitted).

legitimacy statute[21] was *not* relevant to its resolution of the certified question.  *Id.* at 111.[22]

As previously explained, the Arkansas Supreme Court's interpretation of the posthumous heir statute creates a statutory classification under which *all* posthumously born IVF children are treated differently than posthumously born children who are created by natural conception or artificial insemination.  In the context of Plaintiff seeking to obtain Social Security benefits, this statutory classification does not impinge upon a fundamental right or involve a suspect classification such as race or national origin.  Thus, in considering Plaintiff's equal protection argument, it does not warrant application of strict scrutiny.  Neither does it implicate a quasi-suspect classification such as gender or illegitimacy, warranting the application of intermediate scrutiny.  *See F.C.C. v. Beach Comm., Inc.,* 508 U.S. 307, 313 (1993) ("In areas of social economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.")  Accordingly, the Court concludes that, in considering Plaintiff's equal protection argument, the appropriate level of constitutional scrutiny is rational basis review.[23]

Plaintiff does not dispute the state's authority to enact its own rules of intestate succession.

---

[21]*See* Ark. Code Ann. § 28-9-209(c).

[22]Because *Finley* did not turn on any issue surrounding the "legitimacy" of W.F., Plaintiff's reliance on *Jimenez, Mathews,* and *Trimble* is misplaced.  Those cases all involved a classification scheme that turned on whether a child was legitimate or illegitimate.  In *Clark,* the Court made it clear that, for purposes of equal protection, such a classification scheme deserves intermediate scrutiny.

[23]As indicated previously, in Plaintiff's Appeal Brief, she appears to acknowledge that rational basis review is the appropriate constitutional standard.  *See* note 17, *supra,* at 11.

*See Labine v. Vincent*, 401 U.S. 532, 537 (1971) ("the choices reflected by the intestate succession statute are choices which it is within the power of the State to make").  Under the facts in this case, the Arkansas posthumous heir statute, as interpreted by the Arkansas Supreme Court, survives rational basis review given the State's interest "in directing the disposition of property left within the State."  *See Labine*, 401 U.S. at 536 n.6.  Importantly, in the narrow context of resolving the certified question, the Arkansas Supreme Court's interpretation of the posthumous heir statute only limits the paternal inheritance rights of those children, like W.F., who were implanted in their mother's wombs, as IVF embryos, *after the death of their fathers.  See Finley*, 372 Ark. at 109 ("we must, then, determine whether a child, created as an embryo through in vitro fertilization during the child's parents' marriage, but implanted into the child's mother's womb after the death of the child's father, was 'conceived before' the decedent's death.").

The Court acknowledges that the reasoning used in *Finley* is problematic if it were applied in different circumstances.  Specifically, under the *Finley* Court's reasoning, an IVF child implanted as an embryo while his biological father *was alive*, but born *after his father's death,* would *not* be an "heir" and could *not* inherit under the posthumous heir statute.  Yet a similar child conceived by natural conception or artificial insemination, but born after his father's death, would be an "heir" capable of inheriting under the posthumous heir statute.  The state could have *no plausible interest* in a statutory classification that would lead to such an irrational outcome.  If the holding in *Finley* was applied in a case involving an IVF embryo that had been implanted in its mother's womb *before the father's death*, the Court seriously doubts that it could survive rational basis review.

Of course, in this case, the embryo was implanted in Plaintiff's womb almost one year *after* Finley's death.  Under the Arkansas statutes governing intestate distribution, there appears to be

nothing to bar an IVF child born many months or even years after his father's death from filing a claim to reopen the administration of his deceased father's estate in order to claim his intestate share.[24]  The state has a substantial interest in protecting against such an outcome, and one way to do so is to construe the term "heir," in the posthumous heir statute, not to include children created by IVF and implanted in their mothers' wombs *after* the death of their fathers.  Thus, under the facts in this case, the Court concludes that the statutory distinction between those embryos created through IVF and all other children withstands rational basis review.[25]

As the facts in this case demonstrate, cyropreservation technology now allows embryos to be preserved, implanted, and eventually born years after the death of the biological father.  The statutory classification, as interpreted by the Arkansas Supreme Court and applied to the facts in this case, is reasonably related to the State's interest in the orderly, timely, and final disposition of estate property; solves administrative problems that otherwise would be created by heirs who could be born many years after the death of an intestate decedent; and protects the interests of children who were born or conceived  prior to the decedent's death.  Thus, the Court concludes that Plaintiff's first

---

[24]In contrast, Arkansas statutes specifically provide that an illegitimate child must assert a claim against his father's intestate estate within six months of his father's death.  Ark. Code Ann. § 28-9-209(d).  The obvious purpose of this statute is to bar the claims of illegitimate children which otherwise might be asserted many months or years after their fathers' deaths.

[25]Some commentators believe that intermediate scrutiny should apply to classifications based on  posthumously conceived children, just as it does to classifications based on illegitimacy.  *See generally*, Julie E. Goodwin, *Not All Children are Created Equal: A Proposal to Address Equal Protection Inheritance Rights of Posthumously Conceived Children*, 4 CONN. PUB. INT. L.J. 262 (2005); Gloria J. Banks, *Traditional Concepts and Nontraditional Conceptions: Social Security Survivor's Benefits for Posthumously Conceived Children*, 32 LOY. L.A. L. REV. 251 (1999).  Importantly, W.F. was implanted in Plaintiff's womb almost one year after the death of his father.  Given these facts, even if the Court were to apply intermediate scrutiny to the Arkansas posthumous heir statute, as interpreted by the Arkansas Supreme Court, it would still conclude that it is substantially related to the achievement of important governmental objectives.

equal protection argument is without merit.

## 2.  42 U.S.C. § 416(h)(2)(A) And The Equal Protection Clause

Plaintiff's second equal protection argument is that 42 U.S.C. § 416(h)(2)(A), which defines "child" based on the state intestacy law where the insured was domiciled at the time of death, violates equal protection because it allows the social security laws to be applied differently based on the domicile of the insured.[26]  Plaintiff contends that the Court should not "ignore the decisions of the Ninth Circuit,"[27] and that her son will suffer because "he had the ill fortune to be born in a state which has no law concerning inheritance which covers someone in his situation [which] cannot be countenanced." (*Pltff's App. Brf.* at 5-6.)

Section 416(h)(2)(A) contains no express preferences or classifications, other than to incorporate the intestacy law of the state in which the insured was domiciled at the time of death. This classification does not implicate any suspect classification or fundamental right.  Thus, the Court concludes that Plaintiff's equal protection challenge should be analyzed using the rational

---

[26]The Court seriously questions whether Plaintiff should be allowed to make this argument, as well as the remaining arguments in her Appeal Brief.  In Plaintiff's Joint Motion, she requested that a question of law be certified to the Arkansas Supreme Court because it was "determinative" of the outcome in this case.  If the Arkansas Supreme Court answered this question in a way which violated her son's federal constitutional rights, the Court has no difficulty in seeing how that issue would be cognizable in this action.  However, Plaintiff's current argument, and the remaining arguments in her Appeal Brief, are *unrelated* to the narrow and "determinative issue" that she sought to certify to the Arkansas Supreme Court.  Nonetheless, because the Commissioner does not challenge Plaintiff's ability to raise these other unrelated issues, the Court will proceed to the merits of Plaintiff's remaining arguments.

[27]Plaintiff's reference to the "decisions of the Ninth Circuit" is not accompanied by any citation.  The Court assumes Plaintiff is referring to the Court's decision in *Gillett-Netting v. Barnhart*, 371 F.3d 593 (9th Cir. 2004), a case which Plaintiff later cites and discusses in her third point for reversal.  The Court will reserve its discussion of *Gillett-Netting* for section C of its analysis.

basis test.

In *Mathews*, 427 U.S. at 510, the Court held that the statute's various dependency presumptions were "justified as reasonable empirical judgments that are consistent with a design to qualify entitlement to benefits upon a child's dependency at the time of the parent's death." This included the statute's incorporation of state intestacy law: "where state intestacy law provides that a child may take personal property from a father's estate, it may reasonably be thought that the child will more likely be dependent during the parent's life and at his death." *Mathews*, 427 U.S. at 514.

At least two circuit courts of appeal have construed *Mathews* to preclude a constitutional attack on section 416(h)(2)(A) based on its incorporation of state intestacy law. *See Haas v. Chater*, 79 F.3d 559, 564 (7th Cir. 1996) ("Congress has decided that, all other routes to demonstrating the likelihood of support being closed, if the child's state was willing to allow the child to take by intestacy from the putative father this is enough evidence that the putative father would have supported the child to entitle the child to benefits in lieu of that support taken away by death. Congress may not have been required to go that far. [*Mathews*] holds that Congress was not required to go further."), *panel op. vacated and aff'd on reh'g*, 89 F.3d 838 (7th Cir. 1996), *cert. denied*, 519 U.S. 1108 (1997); *accord, King v. Scheiker*, 647 F.2d 541, 545 n. 8 (5th Cir. 1981) (a constitutional attack on section 416(h)(2)(A) and its reference to state intestacy law would fail because the "definition of children in federal statute can be controlled by state law since there is no federal law of domestic relations").

Plaintiff does not develop her equal protection challenge to section 416(h)(2)(A) beyond asserting that, on a state-by-state basis, it can lead to differing results for similarly situated children. Furthermore, she cites no authority to support the proposition that such an incorporation of state law

lacks a rational basis, or that some uniform result is constitutionally required in a federal statute.  The United States Supreme Court has recognized that, while "[t]he scope of a federal right is, of course, a federal question. . . that does not mean that its content is not to be determined by state, rather than federal law."  *De Sylva v. Ballentine*, 351 U.S. 570, 580 (1956) (holding that the question of whether the reference to "children " in federal copyright statute included illegitimate children was answered by reference to state law).  "This is especially true where a statute deals with a familial relationship; there is no federal law of domestic relations, which is primarily a matter of state concern."  *De Sylva*, 351 U.S. at 580.

The Court concludes that section 416(h)(2)(A) is rationally related to legitimate governmental purposes. The incorporation of state intestacy law furthers the purpose of benefitting those children that Congress perceives as most likely being dependent upon the deceased wage earner for support, and furthers administrative convenience by avoiding case-by-case determinations. *See Mathews*, 427 U.S. at 509.  Accordingly, the Court concludes that Plaintiff's second equal protection argument is without merit.

**B.      Plaintiff's Full Faith and Credit Argument**

Plaintiff contends that the Commissioner erred in not giving full faith and credit to the February 14, 2003 Order of the Lonoke County Circuit Court declaring W.F. to be the "legitimate child of Amy R. Finley and Wade W. Finley, Jr. for any and all lawful purposes."[28]  (Tr. 73.)

---

[28]The nature of the *ex parte* state-court proceeding giving rise to this Order is unclear from the record.  Pursuant to Social Security Ruling 83-37c, the Commissioner did not give it binding effect in part because it was an uncontested *ex parte* proceeding.  (Tr. 10.)  In *Voss v. Shalala*, 32 F.3d 1269, 1271 (8th Cir. 1994), a case considering whether a child's benefit claimant was entitled to inherit from the insured under state intestacy law, the Court held that the Commissioner was not bound to give full faith and credit to a state-court probate proceeding, declaring the claimant to be an "heir" of an insured, where the Commissioner was not a party to the *ex parte* proceeding.

According to Plaintiff, the Commissioner is now requesting this Court "to . . . declare that he [W.F.] is not the legitimate child for purposes of the Social Security law," and that the Court "must give Full Faith and Credit to the decision of the Arkansas state court." (*Pltff's App. Brf.* at 6-7.)

The federal "full faith and credit statute" provides that the "judicial proceedings [of any court of any State] shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State." *See* 28 U.S.C. § 1738. The statute "requires federal courts to give state court judgments the same preclusive effect those judgments would be given in the courts of the states rendering them, and to implement the preclusion rules of the state issuing the judgment." *Gas Aggregation Servs. Inc. v. Howard Avista Energy, LLC*, 458 F.3d 733 (8th Cir. 2006) (internal citations omitted).

On its face, the Lonoke Circuit Court Order only establishes the paternity of W.F. Nonetheless, Plaintiff argues that this Order somehow should be construed to mean her son is entitled to inherit from Finley, his biological father, under Arkansas intestacy law. Of course, in doing so, Plaintiff ignores the fact that the Arkansas Supreme Court, in answering the certified question, unequivocally held that W.F. was *not* entitled to inherit under the Arkansas posthumous heir statute. *See Finley*, 372 Ark. at 105. It goes without saying that the Court's decision in *Finley* is final and authoritative and overrides any arguably contrary holding by the Lonoke County Circuit Court. Thus, the Court concludes that Plaintiff's full faith and credit argument is without merit.

**C.    Plaintiff's Argument that Existing Case Law Supports an Award of Benefits**

According to Plaintiff, existing case law supports an award of benefits in this case. The first case she cites is *Gillett-Netting v. Barnhart*, 371 F.3d 593 (9th Cir. 2004), where a married couple in Arizona stored and preserved the husband's sperm because he was scheduled to undergo

chemotherapy which would render him sterile.  Approximately nine months after the husband's

death, his former wife underwent an IVF procedure using her deceased husband's sperm.  After

giving birth to twins, the mother filed a claim for child's insurance benefits.  The Commissioner

denied the claim.

On appeal to the district court, it affirmed the denial of benefits.  *Gillett-Netting v. Barnhart*,

231 F. Supp. 2d 961 (D. Az. 2002).  The court looked to Arizona intestacy law to determine whether

the claimants were children of the deceased insured under section 416(h)(2)(A).  Because the

children were neither born nor "in gestation" at the time of the father's death, the Court held that they

could not inherit as posthumous heirs under the plain language of the Arizona intestacy statute.  It

also rejected the claimants' equal protection claim challenging the statute's reliance on state intestacy

law to determine "child" status.  According to the court, there was a rational basis for conditioning

child status on state intestacy law.

On appeal to the Ninth Circuit, it reversed and awarded benefits.  *Gillett-Netting v. Barnhart*,

371 F.3d 593 (9th Cir. 2004).  The Court considered it unnecessary to resort to state intestacy law to

determine if the children were entitled to "child" status.  The Court held that the various definitions

of "child" set forth in § 416(h) were only intended to apply when the parentage of the child was

disputed.  *Id.* at 597.  Because there was no dispute that the claimants were the biological children

of the insured, the Court concluded that they were "children" of the insured for purposes of the

Social Security Act.  *Id.*  In resolving whether the claimants were dependent upon the insured, the

Court looked to section 402(d)(3), and its statutory presumption of dependency for children who are

legitimate under applicable state law.  *Id.* at 599 (*citing* 42 U.S.C. § 402(d)(3) and *Jimenez*, 417 U.S.

at 635-36.)  The Court concluded that the children were the "legitimate" children of the deceased

insured under Arizona state law:

> [The claimants] are indisputably [the insured's] legitimate children under the law of
> the state in which they reside. "Arizona has eliminated the status of illegitimacy[.]"
> *State v. Mejia*, 97 Ariz. 215, 399 P.2d 116 (1965). In Arizona,"[e]very child is the
> legitimate child of its natural parents and is entitled to support and education as if
> born in lawful wedlock." Ariz. Rev. Stat. § 8-601. "It has long been the policy of
> th[e] state to protect innocent children from the omissions of their parents" by
> abolishing legal distinctions based on legitimacy. *Hurt v. Superior Court*, 124 Ariz.
> 45, 601 P.2d 1329, 1331 (1979). Under Arizona law, [the insured] would be treated
> as the natural parent of [the claimants] and would have a legal obligation to support
> them if he were alive, although they were conceived using in-vitro fertilization,
> because he is their biological father and was married to the mother of the children.
> *See* Ariz. Rev. Stat. § 25-501(providing that children have a right to support from
> their natural parents; the biological father of a child born using artificial insemination
> is considered a natural parent if the father is married to the mother). Although
> Arizona law does not deal specifically with posthumously-conceived children, every
> child in Arizona, which necessarily includes [the claimants], is the legitimate child
> of her or his natural parents.

*Gillett-Netting*, 371 F.3d at 598-99.

As legitimate children under section 402(d)(3), the claimants were presumed to be dependent.

Thus, the Court concluded that it was unnecessary for the children to prove their actual dependency

or  whether they were entitled to inherit under state intestacy law.[29]

According to Plaintiff, *Gillett-Netting* supports an award of benefits in this case because: (1)

there is "absolutely no question" W.F. is the legitimate child of Finley;[30] (2) there is no dispute W.F.

---

[29]Because the Court awarded benefits, it was not required to address the claimants' equal
protection challenge.  *Gillett-Netting*, 371 F.3d at 594 n.1.

After the Court's decision in *Gillett-Netting*, the Commissioner issued Acquiescence Ruling
05-1(9), Fed. Reg. 55,656 (Sep. 22, 2005).  In this ruling, the Commissioner explained his
disagreement with the Ninth Circuit's reading of the statute, but agreed to apply the holding of
*Gillett-Netting* to claims involving an insured who was domiciled within the states encompassed by
the Ninth Circuit.

[30]In making this assertion, Plaintiff must be relying on the language contained in the
February 14, 2003 Order of the Lonoke County Circuit Court.  That Order, which declares W.F. to
be "legitimate," is in direct conflict with the Arkansas legitimacy statute, Ark. Code Ann.

is the biological child of Finley; (3) Finley "acknowledged [the legitimacy of W.F.] in the consents

he signed before his death;" and (4) and there is a state court order establishing the legitimacy of

W.F.  (*Pltff's App. Brf.* At 9.)

The Court questions whether the Eighth Circuit would adopt the reasoning of the Ninth

Circuit in *Gillett-Netting*.  At least one commentator has characterized *Gillett-Netting* as a "novel"

reading of the statute:

> The Ninth Circuit's ruling in *Gillett-Netting* represents a divergence from the reasoning traditionally employed by courts in determining eligibility for Social Security benefits under the Act. In the past, courts have based benefits-eligibility on whether a child has the right to inherit under state intestate succession laws. By contrast, in *Gillett-Netting*, the Ninth Circuit ruled that a posthumously conceived child need only meet the standards of "natural child" and legitimacy under state law to be entitled to benefits. By looking to the biological connection between the deceased parent and posthumously conceived child, in combination with a determination of the child's "legitimacy" under state law, the Ninth Circuit applied a less stringent standard than what the Act seems to require. As a result, the ruling in *Gillett-Netting* may increase the uncertainty that is already inherent in the application of the Act. This uncertainty arises from the fact that some states have laws describing the rights of posthumously conceived children, whereas others have yet to address the issue.

Karen Minor, *Posthumously Conceived Children and Social Security Survivor's Benefits:*

*Implications of the Ninth Circuit's Novel Approach For Determining Eligibility in Gillett-Netting*,

35 GOLDEN GATE L. REV. 85, 102-03 (2005) (internal footnotes omitted).

The Commissioner also points out that, in a number of child's benefit cases, the Eighth

Circuit has looked to whether the claimant would inherit from the insured under state intestacy law

in deciding the claimant's status as a "child" under section 416(h)(2)(A).  *See, e.g., Voss v. Shalala*,

32 F.3d 1269 (8th Cir. 1994) (ALJ correctly determined claimants would not inherit from insured

---

§ 28-9-209, and the Arkansas Supreme Court's decision in *Finley*.

under applicable Nebraska intestacy law and therefore were not entitled to benefits); *Zahradnik v. Sullivan*, 966 F.2d 355 (8th Cir. 1992) (determining that ALJ erred in denying benefits and holding that, under the applicable Oregon intestacy law, claimant would inherit from insured and thus was "child" entitled to benefits); *Luke v. Bowen*, 868 F.2d 974 (8th Cir. 1989) (ALJ correctly determined under applicable South Dakota intestacy law that claimant would not inherit from insured and therefore was not a "child" entitled to benefits).

Finally, even if this Court were to apply the *Gillett-Netting* rationale, Plaintiff's claim would still fail. The Ninth Circuit's analysis of whether the claimant was dependent on the insured turned on an Arizona state law which abolished any distinction between legitimate and illegitimate children. In contrast, Arkansas has a statute addressing the circumstances under a which a child is deemed legitimate. *See* Ark. Code Ann. § 28-9-209. Given the Arkansas Supreme Court's analysis of why a child born under W.F.'s circumstances was not "conceived" before the death of his father under the posthumous heir statute, it is hard to imagine how the same court could find that W.F. was the "legitimate" child of his biological father under the Arkansas legitimacy statute.[31] Thus, the Court

---

[31]The legitimacy statute designates three situations in which a child is deemed legitimate: (1) if a child is born or conceived during a marriage or the couple lived together and participated in a marriage ceremony prior to the birth of their child, but the marriage was later declared void; (2) if a man has a child by a woman, "and afterward intermarries with her and recognizes" the child to be his; and (3) if a child is conceived following artificial insemination of a married woman, with the consent of her husband. Ark. Code Ann. § 28-9-209(a)-(c).

In their briefing to the Arkansas Supreme Court, the parties argued whether Plaintiff was a child "conceived" during his parents' marriage under the artificial insemination subsection of the legitimacy statute, Ark. Code Ann. § 28-9-209(c). In answering the certified question, the Arkansas Supreme Court rejected the parties reliance on this statute in part because it involved legitimacy, which the Court deemed irrelevant to answering the certified question. However, assuming that the question of legitimacy under state law was relevant, it is significant that the Arkansas Supreme Court also rejected the parties' reliance on the legitimacy statute because it addressed only artificial insemination, and *not* in vitro fertilization. Furthermore, in construing the posthumous heir statute, the Court concluded that the General Assembly could not have intended for a posthumous heir in

concludes that Plaintiff's reliance on *Gillett-Netting* is misplaced.

Plaintiff next cites *In re Martin B.*, 841 N.Y.S.2d 207 (2007) (N.Y. Surr. Ct. 2007 ), a case in which the New York Surrogate's Court, in construing a New York trust, discussed whether children created using IVF, three years after the death of their biological father, are the decedent's "descendants" or "issue" under the governing trust documents. (*Pltff's App. Brf.* at 11.) Suffice it to say, the Court does not find anything in *Martin B* to be helpful in resolving the issues raised in this case.

Finally, Plaintiff cites *Woodward v. Commissioner*, 760 N.E.2d 257 (Mass. 2002), to support her argument that she and W.F. are entitled to benefits. In *Woodward*, a child's social security benefits case, the United States district court certified to the Massachusetts Supreme Court the following question: "If a married man and woman arrange for sperm to be withdrawn from the husband for the purpose of artificially impregnating the wife, and the woman is impregnated with that sperm after the man, her husband, has died, will children resulting from such pregnancy enjoy the inheritance rights of natural children under Massachusetts' law of intestate succession?" *Woodward*, 760 N.E.2d at 259. The Court answered the question as follows:

> [I]n certain limited circumstances, a child resulting from posthumous reproduction may enjoy the inheritance rights of 'issue' under the Massachusetts intestacy statute. These limited circumstances exist where, as a threshold matter, the surviving parent or the child's other legal representative demonstrates a genetic relationship between the child and the decedent. The survivor or representative must then establish both

W.F.'s situation to inherit as being "conceived" before his father's death because its underlying legislation, Act 303 of 1969, was enacted years before the advent of IVF technology. The various subsections of the legitimacy statute which establish the criteria for deeming a child legitimate were likewise enacted as part of Act 303 of 1969. *See* 1969 Ark. Acts 303 at § 11; Ark. Code Ann. § 28-9-209(a)-(c). Thus, the Court concludes that, if it had been called upon to answer the question, the Arkansas Supreme Court would have determined that W.F. was not Finley's legitimate child under the Arkansas legitimacy statute.

that the decedent affirmatively consented to posthumous conception and to the support of any resulting child. Even where such circumstances exist, time limitations may preclude commencing a claim for succession rights on behalf of a posthumously conceived child.

*Id.*

Plaintiff fails to explain how *Woodward*, which involved an interpretation of Massachusetts intestacy law, is applicable in this case.[32]  However, by relying on *Woodward*, Plaintiff implies that this Court should reinterpret Arkansas intestacy law to reach a conclusion different from the one expressed by the Arkansas Supreme Court in *Finley*.  It is not the role of this Court to pick and choose among alternative constructions of an Arkansas statute after the Arkansas Supreme Court has interpreted the statute as requested by the parties and the Court.  Thus, the Court concludes that Plaintiff's final argument is without merit.

### III. Conclusion

The Court has reviewed the entire record, including the Appeal Briefs and the Commissioner's decision.  The Court concludes that the record as a whole contains ample evidence that "a reasonable mind might accept as adequate to support [the] conclusion" of the Commissioner in this case. *Richardson v. Perales*, 402 U.S. at 401; *see also, Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir. 2004).  The Court further concludes that the Commissioner's decision

---

[32]Because intestate succession is a state law matter, it is obvious that courts interpreting differing state laws might reach different results.  The Commissioner points out that the New Hampshire Supreme Court, like the Arkansas Supreme Court in this case and the Massachusetts Supreme Court in *Woodward*, recently considered a similar certified question originating from a child's benefits case, and answered "no" to the following question: "Is a child conceived after her father's death via artificial insemination eligible to inherit from her father as his surviving issue under New Hampshire intestacy law?" *Khabbaz v. Commissioner*, 930 A.2d 1180 (N.H. 2007). After that decision, the parties returned to the underlying Social Security case and stipulated to the entry of judgment in favor of the Commissioner. *See Eng as Mother of Khabbaz v. Commisioner*, D. N.H. 1:06CV00206-PB at docket entry #14.

is not based on legal error.

IT IS THEREFORE RECOMMENDED that the final decision of the Commissioner be affirmed and Plaintiff's Complaint be dismissed, with prejudice.

DATED this 22nd day of January, 2009.

_____

UNITED STATES MAGISTRATE JUDGE